O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PARTNERS FOR HEALTH AND HOME, L.P., ETC., | ) ) ) | CASE NO. CV 09-07849 RZ |
| Plaintiff, | ) ) | UNDISPUTED FACTS AND CONCLUSIONS OF LAW |
| vs. | ) ) | |
| SEUNG WEE YANG, ETC., ET AL., | ) ) | |
| Defendants. | ) ) ) | |

## UNDISPUTED FACTS

1.     In the 1980's in New York, Domenico Santorelli, who is not a party to these proceedings, began selling stainless steel cookware under the brand name Perma-Life®.

2.     In 1986, Ki Won ("Jean") Shim entered into a 50-50 business partnership with Mr. Santorelli whereby they would jointly own and operate the Perma-Life cookware business, including specifically the Perma-Life trademark.

3.     In 2002, Ms. Shim purchased from Domenico Santorelli the rights to the Perma-Life trademark and to U.S. Trademark Registration No. 2,029,777 ("the '777 Registration") for the goods of, *inter alia*, metal cookware, and the goodwill associated with that mark.

4.     Since purchasing the rights to the Perma-Life trademark and associated goodwill of the business from Mr. Santorelli, together Ms. Shim and Plaintiff Partners for Health & Home, L.P. ("Partners"), of which Ms. Shim is the President, have continuously sold stainless steel cookware under the Perma-Life trademark.

5.     In 2008, Plaintiff's prior trademark counsel, Paul Supnick, transferred his files for Jean Shim, including the trademark files, to Plaintiff's current counsel, Joel Voelzke.

6.     In reviewing those incoming files, Mr. Voelzke noticed that Mr. Supnick had failed to renew the '777 registration and that the time period for filing a late renewal had expired.  Mr. Voelzke filed a new trademark application to re-register the Perma-Life trademark.

7.     The time period from the time that the PTO officially declared the '777 registration lapsed on June 6, 2008, until the day that attorney Voelzke filed the new application on June 8, 2008, was one day.

8.     The application filed by attorney Voelzke registered as Registration No. 3,564,113 ("the '113 Registration") on January 20, 2009 for the mark Perma-Life.

9.     The '113 Registration is a valid and subsisting federal trademark registration for the mark Perma-Life.

10.     The period during which there was no federal trademark registration for Perma-Life owned in whole or in part by Plaintiff, its principal Jean Shim, or a predecessor company in which Jean Shim was part owner, was less than 8 months (from June 6, 2008 until January 20, 2009).

11.     In 2009, Ms. Shim assigned both of the registrations, including the goodwill associated with the mark and the right to sue for past infringements, to Plaintiff Partners for Health and Home, L.P. ("Partners"), of which she is the President.

12.     At no time from 1986 until the present did Ms. Shim or her companies ever stop selling Perma-Life cookware, whether through her partnership with Domenico Santorelli, through her company Perma-Life Cookware, or through her company Partners.

13.   Defendant S T P America, Inc. ("STP") is 100% owned by Defendant Seung Wee ("Edward") Yang.

14.   Defendant Seung Wee Yang made all of the managerial decisions for STP.

15.   Defendant Seung Wee Yang made all of STP's marketing and advertising decisions.

16.   For several years, Defendant Yang imported "health mattresses" and water purifiers from Korea.

17.   From about October 2005 to about April 2007, Plaintiff purchased mattresses and water purifiers from Mr. Yang, and used its distribution network to sell those products to end customers in America.

18.   In January 2008, Mr. Yang began selling stainless steel cookware; he called his new cookware Pearl Life.

19.   Defendants sold approximately $400,000 worth of Pearl Life cookware.

20.   Defendants' purchase price for that cookware from the manufacturer was approximately $223,708.

21.   Occasionally, Defendants advertised their cookware as being "PEARL-LIFE" (with a hyphen).

22.   A significant target market for both Plaintiff's cookware and Defendants' cookware is the Korean American community in the Los Angeles area.

23.   In their discovery answers, Defendants claimed to be unable to remember any way in which they had ever used Plaintiff's Perma-Life trademark within their own advertising to sell their competing Pearl Life cookware.

24.   In 2006, Mr. Yang registered the domain name www.permalife.co.kr.

25.   Mr. Yang placed, or caused to be placed, the metatag "permalife" on the website located at www.permalife.co.kr.

26.   Mr. Yang placed the www.permalife.co.kr domain for sale by stating on that website that the domain was "For Sale."

27.    On July 9, 2008, Mr. Yang registered a second Korean domain, www.perma-life.co.kr.

28.    Mr. Yang admitted in deposition that in early 2007 his relationship with Ms. Shim fell apart; then more than a year later, he registered the domain www.perma-life.co.kr and linked it to his www.pearllife.com website (framed that website) from which he advertised his Pearl Life cookware; then later he put the www.perma-life.co.kr domain up for sale, all without ever telling Ms. Shim that he had done those things.

29.    Mr. Yang repeatedly denied in this litigation that Exhibit 4 to the Complaint, which showed the domain www.perma-life.co.kr being used to promote Mr. Yang's own Pearl Life cookware, was an accurate representation of what the website at www.perma-life.co.kr looked like.

30.    Mr. Yang admitted in deposition however, that Exhibit 3 to the deposition (which is identical to Exhibit 4 to the Complaint) was an accurate representation of what www.perma-life.co.kr looked like.

31.    Mr. Yang admitted in deposition that he had caused the domain www.perma-life.co.kr to be "linked" or "forwarded" to his "home page" at www.pearllife.com.

32.    Contrary to his deposition testimony, Mr. Yang did not actually stop linking (framing) www.perma-life.co.kr to his own Pearl Life website until at least October 2009.

33.    Mr. Yang repeatedly denied in this litigation that he had caused the metatags "perma-life" and "perma life" to be placed on the website at www.perma-life.co.kr.

34.    That source code for the website www.perma-life.co.kr contained the terms "perma life" and "permalife" as metatags.

35.    Mr. Yang instructed his website designer, Steven Kim, to place "perma-life" as a metatag on that website.

36.     Mr. Yang posted videos on the Internet promoting his Pearl Life cookware to which he applied Plaintiff's Perma-Life trademark as visible tags (indexing tags); he posted such videos on the video sharing sites YouTube (www.youtube.com), and Tag Story (www.tagstory.com), and on his "blog" at Daum (www.daum.net).

37.     Mr. Yang's intent in applying Plaintiff's Perma-Life trademark as indexing tags for videos was to divert consumers who were looking for Plaintiff's Perma-Life cookware on the Internet to his www.pearllife.com website from which he sold his Pearl Life cookware.

38.     In their Answers, Defendants denied having purchased "PERMA-LIFE" as a search engine advertising keyword.

39.     Mr. Yang, however, did in fact purchase from Google, Inc. the term "permalife" as an Internet search engine advertising keyword.

40.     In sum, Defendants used Plaintiff's Perma-Life trademark in the following ways: (1) as a domain name through which they framed their www.pearllife.com website at which they promoted their competing Pearl Life cookware; (2) as metatags on their websites at which they promoted their Pearl Life cookware; (3) as Google Internet search engine advertising keywords to direct consumers to their www.pearllife.com website; and (4) as visible video tags which act as indexes on their videos which they posted at various Internet video sharing websites including at least YouTube (www.youtube.com) and Tag Story (www.tagstory.com), and at a "blog" site at Daum (www.daum.net).

41.     Defendants posted on their www.pearllife.com website a large photograph of Defendant Yang shaking hands with the original founder of Perma-Life cookware, Domenico Santorelli, and text below the photograph stating that Defendants entered into an "agreement" with Mr. Santorelli, falsely implying a connection between Defendants and Plaintiff's Perma-Life cookware.

42.     Defendants never sold any Perma-Life cookware.

43.     The text accompanying the photograph states that the company [i.e., the company formerly selling Perma-Life] has changed names to "New Life" and is now being operated by Mr. Santorelli's daughters.

44.     Ms. Shim sold Perma-Life cookware continuously from 1986 to the present.

45.     A significant number of consumers have actually been confused between Pearl Life and Perma-Life, and/or between Plaintiff and Defendants.

46.     Defendants did not seek advice of counsel before using Plaintiff's Perma-Life trademark to promote their own Pearl Life cookware, nor did they seek advice of counsel on that issue even after this action was initiated against them.

47.     Defendants did not respond to numerous cease-and-desist demands from Plaintiff that Defendants stop using Plaintiff's Perma-Life trademark in their advertising.

48.     Any Conclusion of Law hereafter determined to be an undisputed fact is hereby made an undisputed fact.

## CONCLUSIONS OF LAW

1.     Any finding of fact which is hereafter determined to be a conclusion of law is hereby made a conclusion of law.

2.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121.

3.     Summary judgment or partial summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

4.     Summary judgment may be granted when "no reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The court must afford all reasonable

inferences and construe the evidence in the light most favorable to the non-moving party. *See id*. at 255.  To defeat summary judgment, the evidence as properly construed must be sufficient for a reasonable jury to find for the nonmoving party; a mere scintilla of evidence will not suffice.  *Id*. at 252.

5.     An individual who personally directs a corporation in committing trademark infringement, or who personally commits those acts, is personally liable for that infringement. 15 U.S.C. §§ 1114 & 1127; *Mead Johnson & Co. v Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968); *Wilden Pump & Eng'r Co. v. Pressed & Welded Prods. Co.*, 655 F.2d 984, 990 (9th Cir. 1981); *Chanel Inc. v. Italian Activewear of Florida Inc.*, 931 F.2d 1472, 1477-78, 19 U.S.P.Q.2d 1068 (11th Cir. 1991).

6.     This is particularly true when a single individual is the corporation's sole shareholder, sole officer, and sole manager, and performs the infringing acts himself; that person will be individually liable for the intellectual property infringements committed by the corporation. *Playboy Enterprises Inc. v. Chen*, 45 U.S.P.Q.2d 1400, 1412 (C.D. Cal. 1997).  Such personal liability does not depend on piercing the corporate veil.  *Id*.

7.     Defendant Yang as sole shareholder, sole officer, sole manager, the sole individual responsible for advertising for Defendant S T P America, Inc., and the person who personally committed the acts relevant to this action, is personally liable for all of those acts.

8.     Plaintiff's trademark was federally registered from September 2, 1997 to June 6, 2008 as U.S. Trademark Reg. No. 2,092,777, and was federally registered as U.S. Trademark Reg. No. 3,564,113 from January 20, 2009 to the present.

9.     At all relevant times, Plaintiff also had common law trademark rights and rights under the Lanham Act § 43(a), through continuous use in commerce, of the Perma-Life mark.

10.     Under 15 U.S.C. § 1125(d)(1)(A), the Anti-Cybersquatting Consumer Protection Act (ACPA), a person is civilly liable for cyberpiracy (aka cybersquatting) to a trademark owner if that person (i) "has a bad faith intent to profit from a mark . . . and

(ii) registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark." *Id*. The statute lists nine non-exclusive factors to be considered in deciding whether the domain registrant acted in "bad faith." Those factors are:

> (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III)  the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII)  the person's provision of material and misleading false contact information when applying for the registration of the domain name, the

person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B).

11.    It does not matter whether a trademark is a "dot com" or has a "dot country code" at the end, in a case such as this in which the defendant resides in the United States, the trademark owner resides in the United States, and the domain is accessed by United States customers. See *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 939 F. Supp. 1032 (S.D.N.Y. 1996) (holding defendants in contempt of court for registering and operating Italian domain www.playmen.it accessible by U.S. customers in violation of ACPA, where defendants had previously been adjudged to be infringers of the PLAYMEN trademark and had been ordered to cease infringing that mark).

12.    Plaintiff is entitled to summary adjudication of cyberpiracy against Defendants with respect to Defendants' registration and attempts to sell the domain www.permalife.co.kr.

13.    Plaintiff is entitled to summary adjudication of cyberpiracy against Defendants with respect to Defendants' registration and use of the domain www.perma-life.co.kr to promote and sell Defendants' Pearl Life cookware.

14.     It is an infringement of a trademark to use in commerce any sufficiently similar word or device such that consumers are likely to be deceived regarding the source, affiliation, or sponsorship of the goods being offered for sale.  See 15 U.S.C. § 1114(1) (infringement of a registered trademark) and 15 U.S.C. § 1125(a) (Lanham Act § 43(a), false designation and false descriptions, regardless of whether a registered mark is involved).

15.     The core element of trademark infringement is whether customers are likely to be confused about the course or sponsorship of the products.

16.     An eight-factor test – the so-called Sleekcraft factors (*AMF v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)) – guides the assessment of whether a likelihood of confusion exists.  The Sleekcraft factors are:

    (1)     the strength of the mark;

    (2)     proximity or relatedness of the goods;

    (3)     the similarity of the marks;

    (4)     evidence of actual confusion;

    (5)     the marketing channels used;

    (6)     the degree of care customers are likely to exercise in purchasing the goods;

    (7)     the defendant's intent in selecting the mark; and

    (8)     the likelihood of expansion into other markets.

17.     The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.  *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1173, 84 U.S. P.Q.2d 1865, 1871 (9th Cir. 2007) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)) (citations and internal quotations omitted).

18.     In the Internet context, the three most important Sleekcraft factors in evaluating a likelihood of confusion are:

> (1)     the similarity of the marks,
>
> (2)     the relatedness of the goods and services, and
>
> (3)     the parties' simultaneous use of the Web as a marketing channel.

*Perfumebay.com*, 506 F.3d at 1173.

19.     When these factors suggest that confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement. On the other hand, if these three factors do not clearly indicate a likelihood of consumer confusion, then a district court can conclude the infringement analysis only by balancing all the Sleekcraft factors within the unique context of each case. *Perfumebay.com*, 506 F.3d at 1173-74 (citations and internal quotations omitted).

20.     "[A]n intent to confuse customers is not required for a finding of trademark infringement." *Brookfield Communications Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1059, 50 U.S.P.Q.2d 1545 (9th Cir. 1999). However, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993).

21.     "[O]ne who intends to confuse is more likely to succeed in doing so." *Cable News Network LP, LLLP v. CNNews.com*, 177 F. Supp. 2d 506, 520 (E.D. Va. 2001).

22.     "[E]vidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *GoTo.com. Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000) (quoting *Sleekcraft, supra*).

23.     The person using another's trademark in commerce bears the burden of demonstrating that the use of the trademark is authorized by law, *i.e.*, is a fair use.  *See* 15 U.S.C. § 1115(b).

24.     As a general rule, using another party's trademark on an Internet website without authorization, and without legal justification, constitutes trademark infringement *per se*.  *See, e.g.*, *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238, 77 U.S.P.Q.2d 1968, 1972 (10th Cir. 2006).

25.     "Initial interest confusion" occurs when a user is initially attracted to a defendant's website or products based on an initial impression that the defendant sells the trademarked product, even if that user eventually realizes before purchasing that the products being offered are not the trademarked goods.  Using another's trademark or a similar trademark in a way that causes initial interest confusion is one type of trademark infringement, and is actionable.  *Australian Gold*, *supra*, 436 F.2d at 1238-39, 1240.

26.     Using a competitor's trademark as an Internet search engine advertising keyword constitutes trademark infringement, absent particular circumstances that would negate any likelihood of confusion.  *Id.; Storus Corp. v. Aroa Mktg. Inc.*, 87 U.S.P.Q.2d 1032 (N.D. Cal. 2008).

27.     Using another party's trademark as website metatags without legal justification constitutes willful trademark infringement, and renders evidence of actual confusion unnecessary.  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1064, 50 U.S.P.Q.2d 1545, 1565-66 (9th Cir. 1999); *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 67 U.S.P.Q.2d 1532 (9th Cir. 2003); *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 88 U.S.P.Q.2d 1051 (1st Cir. 2008).

28.     Copying another party's trademark exactly within a domain name "creates a presumption of likelihood of confusion among Internet users as a matter of law." *PETA v. Doughney*, 113 F. Supp. 2d 915, 919-20 (E.D. Va. 2000) (citing *N.Y. State Society of Certified Public Accountants v. Eric Louis Assoc., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999)), aff'd, 263 F.3d 359 (4th Cir. 2001).  Under such circumstances, the court

1  can grant summary judgment of trademark infringement.  *Id.*; *see also Brookfield*
2  *Communications*, *supra*, 174 F.3d at 1057.

3       29.  Because bad faith intent to profit from another's trademark is a
4  necessary element of a claim for cyberpiracy under the ACPA, using a domain that
5  incorporates another's trademark in a way that is also likely to create consumer confusion
6  also constitutes willful trademark infringement.

7       30.  Defendants have infringed Plaintiff's Perma-Life trademark by each of
8  the following acts, taken either individually or as a whole:

10      a.  Registering the domain www.perma-life.co.kr and using
11  it to promote their competing Pearl Life cookware;

12      b.  Applying the metatags "perma life" and "permalife" to the
13  website at www.perma-life.co.kr through which they sold their
14  competing Pearl Life cookware;

15      c.  Applying the term "permalife" as visible video tags
16  (indexes) on videos promoting Pearl Life cookware which they posted
17  on the Internet at video sharing websites YouTube (www.youtube.com)
18  and Tag Story (www.tagstory.com), and on the "blog" site Daum
19  (www.daum.net).

20      d.  Purchasing the term "permalife" as an Internet search
21  engine advertising keyword to direct Internet users to their website at
22  www.pearllife.com at which they advertised their Pearl Life cookware.

24       31.  Failure to seek a legal opinion of counsel as to infringement, especially
25  after receiving a cease-and-desist letter, is probative evidence of an infringer's willfulness.
26  *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523, 92 U.S.P.Q.2d 1835 (S.D.N.Y. 2009).

32.     The marks "Pearl Life" and "PEARL-LIFE," when applied to the goods of stainless steel cookware, are confusingly similar to PERMA-LIFE for stainless steel cookware.

33.     Where trademark infringement is found, it follows that the defendant is also liable for violating § 43(a) of the Lanham Act. *Conversive Inc. v. Conversagent Inc.*, 433 F. Supp. 2d 1079, 1093, 79 U.S.P.Q.2d 1284, 1293-94 (C.D. Cal. 2006); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 975 n.90 (C.D. Cal. 2002) ("The standard for Lanham Act unfair competition is the same as that for Lanham Act trademark infringement."); *Brookfield Communications*, *supra*, 174 F.3d at 1045 (both trademark infringement and unfair competition under the Lanham Act require establishing that the defendant is using a mark confusingly similar to a valid, protectable trademark of the plaintiff).

34.     Defendants are liable for violating the Lanham Act § 43(a), for the same reasons as they are liable for trademark infringement.

35.     Defendants are liable for violating the Lanham Act § 43(a) for the additional reasons that they:

> (a)     falsely told consumers that PEARL LIFE cookware is the same cookware as PERMA-LIFE cookware;
>
> (b)     falsely told consumers that their company is the same company as Plaintiff.

36.     Trademark infringement under 15 U.S.C. § 1114(1) also constitutes trademark counterfeiting when the infringer uses a "counterfeit mark," which is defined as "a counterfeit of a mark that is registered on the principal register of the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use . . . ." 15 U.S.C. § 1116(d)(1)(B)(i).

37.   Defendants' use of Plaintiff's trademark in the various ways listed above constitutes trademark counterfeiting.  *See Aztar Corp. v. MGM Casino*, 59 U.S.P.Q.2d 1460, 1463 (E.D. Va. 2001) (finding defendants liable for both cyberpiracy and trademark counterfeiting, where defendant registered a domain name that incorporated plaintiff's trademark exactly, and used that trademark in visible text on the website as the name of that website).

DATED:   October 28, 2011

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE